E-FILED
Thursday, 04 November, 2021  01:26:35 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

**CANDICE MARTIN, individually**
**And as Executor of the Estate of**
**Rodney Martin, Deceased**
306 James Lane
Henry, IL 61537

Case No. **1:21-cv-1323**

vs.

**Judge**

**GOODRICH CORPORATION,**
Formerly known as
B.F. GOODRICH COMPANY
Four Coliseum Centre
Charlotte, NC 23217-4578

Serve at:
CT Corporation System
208 So. LaSalle St., Suite 814
Chicago, IL 60604

and

**POLYONE CORPORATION,**
Individually and as successor-in-interest to
The GEON COMPANY
Suite 36-5000
200 Public Square
Cleveland, OH 44114-2304

Serve at:
CT Corporation System
208 So. LaSalle St., Suite 814
Chicago, IL 60604

**COMPLAINT AND DEMAND FOR JURY TRIAL**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

1

Plaintiff Candice Martin, Individually and as Executor of the Estate of Rodney Martin, as and for her Complaint against Defendants Goodrich Corporation, fka B.F. Goodrich Company, and PolyOne Corporation, successor-in-interest to The Geon Company and B.F. Goodrich Company, states upon information and belief as follows:

## I. PARTIES

1. Plaintiff Candice Martin is the surviving spouse of Rodney Martin, deceased. She and her husband have at all relevant times been citizens and residents of Henry, Illinois.

2. Plaintiff Candice Martin brings this action individually on her own behalf and as Executor of the Estate of Rodney Martin, deceased, asserting claims for wrongful death on behalf of herself and their children pursuant to 740 ILCS 180/1 et seq., and a survival action for injuries and damages incurred by Decedent prior to his death pursuant to 755 ILCS 5/27-6. Candice Martin is the mother and next best friend of Jaqueline Martin, daughter of Rodney Martin and Candice Martin, who is a developmentally disabled adult. Rodney Martin is also survived by his adult children Melody Tonarelli and Jeff Martin.

3. Starting in April of 1966, Plaintiff's decedent, Randy Martin (hereinafter referred to individually as "Decedent") was exposed to vinyl chloride while working as an employee of B.F. Goodrich Company, nka Goodrich Corporation in the Henry, Illinois plant where vinyl chloride was processed into polyvinyl chloride. Decedent retired in October of 2012.

4. Defendant Goodrich Corporation, formerly known as B.F. Goodrich Company, is incorporated in the State of New York and has its principal place of business in the State of North Carolina.

5. Defendant PolyOne Corporation, successor-in-interest to The Geon Company, the

2

successor-in-interest to B.F. Goodrich Company, is incorporated in the State of Ohio and has its principal place of business in the State of Ohio.

6.     In or about 1993, B.F. Goodrich Company spun off its vinyl chloride business, including the Henry plant, to The Geon Company, a former division of the B.F. Goodrich Company.  The Geon Company is a successor-in-interest to the B.F. Goodrich Company.  The Geon Company, after a merger with M.A. Hanna Co. in 2000, became PolyOne Corporation. PolyOne Corporation is a successor-in-interest to B.F. Goodrich Company and the Geon Company.

7.     B.F. Goodrich Company (hereinafter B.F. Goodrich) has changed its name to Goodrich Corporation.  Hereinafter, the B.F. Goodrich Company, The Geon Company, and PolyOne Corporation, and Goodrich Corporation are identified collectively as "BFG."

## II.  JURISDICTION AND VENUE

8.  At all relevant times Decedent was employed at the BFG vinyl chloride plant in Henry, Illinois where he was wrongfully exposed to excess amounts of vinyl chloride that proximately caused him to develop angiosarcoma of the liver.

9.  This court has subject matter jurisdiction over this matter because much of defendants' wrongful conduct that proximately caused the injuries to Plaintiff Candice Martin and Decedent occurred within the State of Illinois. This court also has subject matter jurisdiction because Plaintiff's and Decedent's injuries occurred within the State of Illinois.

10.   The matter in controversy exceeds $75,000 exclusive of interest and costs and the controversy is between citizens of different states.

11.   This court has personal jurisdiction over each of the defendants because each

3

defendant committed wrongful acts in this State and are or were at all relevant times doing business in this State that proximately caused the injuries to Plaintiff and Decedent.

12.   Venue properly lies in this Court because a substantial amount of the wrongful activities conducted by defendants that proximately caused the injuries to Plaintiff and Decedent, and gave rise to Plaintiff's claims for relief, occurred within this District in Marshall County, Illinois. At all times relevant to this Complaint, BFG conducted tortious activities and made decisions relating to the manufacture, use, distribution and control of vinyl chloride, including health and safety matters, in Marshall County, Illinois.

### III.  <u>NATURE OF CLAIMS</u>

13.   This action is brought on behalf of all the Decedent's next of kin, including his Candice Martine, his surviving spouse, and Jaqueline Martin, Melody Tonarelli and Jeff Martin, their children, to assert all rights and remedies permitted with respect to a wrongful death action. Plaintiff therefore seeks damages for the pecuniary injuries resulting from the death of Decedent and damages for the grief, sorrow, and mental suffering incurred by Decedent's surviving spouse and next of kin.

14.   This action is also brought on behalf of the Estate of Decedent to assert all rights and remedies permitted with respect to a survivorship action for the pain and suffering, medical expenses, loss of enjoyment of life and all other injuries and damages suffered by Decedent prior to his death as a proximate result of defendants' misconduct.

15.   This action is also brought by Plaintiff, individually, for the loss of consortium, support, society, love and affection of her husband prior to his death.

### IV.  BACKGROUND

16.  Decedent was first employed by B.F. Goodrich in its Henry, Illinois plant in April of

1966; he remained an employee of the B.F. Goodrich Company, The Geon Company, and PolyOne Corporation until he retired in October of 2012.

17.   During the course of his employment at the Henry plant, Decedent worked at various jobs, including but not limited to bagger, poly building helper, recovery operator, pearl charge operator, losope charge operator, and safety & environmental operator.  During his employment from April of 1966 until sometime in 1974 Decedent's jobs involved working with and being exposed to hazardous levels of vinyl chloride monomer (VCM).

18.   VCM is a colorless gas and can remain in a gaseous state at room temperature.  The odor threshold for VCM is at or above 2,000 ppm.  At least prior to 1974, Decedent could often smell vinyl chloride while he was working.

19.   While engaged in the course of his employment with BFG, Decedent was required and caused to work with, and in the vicinity of, vinyl chloride monomer and vinyl chloride-containing products.  (Vinyl chloride monomer and vinyl chloride-containing products may be referred to collectively as "vinyl chloride" or VC throughout this Complaint.)

20.   Decedent's exposure to vinyl chloride, from the time he was hired in 1966 until sometime in 1974 when VC exposures were drastically reduced, was the direct and proximate cause of his developing a cancer of the liver known as hepatic angiosarcoma.  Decedent was diagnosed with angiosarcoma of the liver on December 11, 2019, as a direct and proximate result of the tortious misconduct of the defendants; he died on July 9, 2020.

21.   Prior to his death, Decedent incurred substantial medical expenses, suffered severe pain of mind and body, disability, limitation, and loss of the pleasures of life.

22.   Decedent was damaged in the following particulars:

(a)      Decedent suffered great physical pain, suffering and mental anguish;

5

(b)     Decedent incurred hospital and/or medical and/or pharmaceutical and/or other expenses;

(c)     Decedent suffered disability;

(d)     Decedent required medical monitoring to aid in monitoring the progression of his illness;

(e)     Decedent required domestic health, nursing and hospice care prior to his death;

(f)     Prior to contracting angiosarcoma of the liver, Decedent was extremely active and participated in numerous hobbies and activities, all of which he was prevented from engaging prior to his death due to the development of his illness and injuries; and

(g)     Decedent was prevented from participating in and enjoying the benefits of a full and complete life as a proximate result of contracting angiosarcoma of the liver.

23.  Plaintiff's claims against defendants are based upon the fact that any claims Decedent might have had under the Illinois Workers' Occupational Disease Act or Workers Compensation Act against his employers, B.F. Goodrich Company, nka Goodrich Corporation, and PolyOne Corporation, are barred by the repose provisions of those acts. Plaintiff has a nonwaivable right to bring a civil action against Decedent's employer for injury and death resulting from an occupational disease under Public Act 101-0006, 820 ILCS 310/1.1 and 820 ILCS 805/1.2 (which became effective on May 17, 2019, before Decedent was diagnosed with angiosarcoma of the liver) which removed the exclusive remedy provision under the Occupational Disease Act and Workers Compensation Act where claims such as those of Plaintiff and Decedent are barred by a repose provision.

## PARTICULARIZED ALLEGATIONS

**A:  Agreement to draft, publish and distribute SD-56 to conceal knowledge about the dangers of vinyl chloride.**

24.  In or about 1930, Patty and the U.S. Bureau of Mines conducted a study of the acute toxic effects of vinyl chloride on guinea pigs.  The study indicated injury to the liver and

6

spleen resulting from VC exposure.

25.  The vinyl chloride (VC) and polyvinyl chloride (PVC) industry, through its trade

organization, recommended an exposure limit (TLV) of 500 ppm as a time weighted average

(TWA), largely as a result of Patty's guinea pig study. B.F. Goodrich and its industry group had

no reasonable basis for believing this exposure level was safe for systemic, chronic effects from

long-term exposures.  B.F. Goodrich and its industry group recommended and advocated the use

of this 500 ppm  TWA exposure limit for polyvinyl chloride (PVC) plants and fabrication

facilities, including the Henry, Illinois plant where Decedent worked, in spite of their knowledge

that there was no scientific evidence supporting 500 ppm as a safe level for chronic injury or

liver damage. B.F. Goodrich accepted and recommended the 500 ppm TWA exposure limit

based exclusively on the Patty and the U.S. Bureau of Mines guinea pig study.

26.  Multiple relatively early studies indicated that VC causes liver injuries to

exposed workers.  These studies include a 1949 report of liver injury among Russian VC

workers; a 1957 Russian study again reporting liver injuries in VC workers; a 1959 Dow

Chemical study showing liver damage in animals from exposures to VC as low as 100 ppm and

an inability to identify a "no-effect" level (resulting in Dow Chemical adopting a 50 ppm

exposure limit for its own plants); and a 1959 Canadian study showing liver injury to animals

exposed to VC (resulting in Ontario, Canada lowering the exposure limit from 500 ppm to 50

ppm).

27.  In 1953, the Manufacturing Chemists Association (MCA), later named the Chemical

Manufacturing Association (CMA), and still later called the American Chemical Council (ACC),

the trade association for the American chemical industry at all times relevant to the instant

action, along with the active participation of its General Safety Committee, drafted a chemical

safety data sheet for VC, known as SD-56. The MCA adopted SD-56 in 1954. B.F. Goodrich

participated in the process of drafting, approving, revising, publishing and disseminating SD-56.

28.   In spite of the information contained in studies known to B.F. Goodrich and other

companies in the MCA, and the absence of test data identifying a safe exposure limit, SD-56

stated that 500 ppm TWA was a safe exposure limit and that the only hazards from VC were fire,

explosion, frostbite burns and a mild general anesthesia.

29.  B.F. Goodrich chose to disseminate SD-56 and the information contained therein,

and nothing contrary to SD-56, in order to conceal the hazards of vinyl chloride from workers,

including Plaintiff.  B.F. Goodrich agreed with other members of the MCA that they would reject

and prevent any changes to SD-56 that might disclose complete and accurate information about

vinyl chloride health hazards.

30.  SD-56 fraudulently concealed known facts about VC.  In spite of B.F. Goodrich's

knowledge to the contrary, and its knowledge that it lacked the facts to make such assertions,

SD-56, as approved by B.F. Goodrich, stated:

8.      HEALTH HAZARDS AND THEIR CONTROL

8.1      Hazards

8.1.1   GENERAL
   Aside from the risk of fire or explosion, vinyl chloride presents no other very
serious problem in general handling.   The presently accepted maximum allowable
concentration is 500 ppm.

8.1.2   SYSTEMIC EFFECTS
   In concentrations well above 500 ppm. vinyl chloride acts as a mild general
anesthetic.

8.1.3   LOCAL EFFECTS
   In contact with the skin vinyl chloride *is irritating*.  Prolonged contact will result

8

in refrigeration and freezing.

8.2   Prevention and control
    Vinyl chloride is not a serious industrial hazard provided precautions are taken to avoid leaks or spills which might provide a fire or explosion hazard.

31.  SD-56, and the information contained therein, was distributed and disseminated by B.F. Goodrich to employees with the intent that it be relied upon throughout the industry and by workers, including Plaintiff, but to disclose only the mild hazards of VC which B.F. Goodrich wished to disclose.

32.   Decedent relied to his detriment upon SD-56 and the information disseminated by B.F. Goodrich similar to that contained in SD-56.

33.  B.F. Goodrich used and disseminated SD-56, and the information contained therein, knowing it to be false and fraudulent, and intending it to be used to train its employees, including Decedent.

34.  B.F. Goodrich was one of the companies responsible for drafting SD-56 and disseminated the information contained in SD-56, and no other warning information, to its employees until the mid-1970s.

35.  On May 12, 1959, V.K. Rowe of Dow Chemical wrote to B.F. Goodrich's Corporate Industrial Hygienist, W.E. McCormick, regarding vinyl chloride's chronic toxicity and the inadequacy of the then existing exposure standard published by the American Conference of Governmental Industrial Hygienists, stating: "We feel quite confident, however, that 500 ppm is going to produce rather appreciable injury when inhaled seven hours a day, five days a week for an extended period."  This information was not provided to Decedent or other employees in the B.F. Goodrich plants.  In spite of its knowledge that 500 ppm was not a safe exposure limit, B.F.

9

Goodrich continued to publicly support that limit and disseminated SD-56.

36.  On November 24, 1959 Union Carbide acknowledged in inter-company correspondence that the TLV of 500 ppm had been "based largely on single guinea pig inhalation studies by the Bureau of Mines about 25 years ago." The letter also noted that V.K. Rowe had stated that Dow Chemical's inhalation study "has not found a no-effect level. Even 100 ppm produced organ weight changes and gross pathology with micropathology expected. The author concluded that vinyl chloride monomer is more toxic than has been believed." All of this information had been communicated to B.F. Goodrich which then agreed with others in the MCA that SD-56 would not be changed; and B.F. Goodrich continued to tell workers, including the Plaintiff, that exposure to vinyl chloride below 500 ppm was safe; nor did B.F. Goodrich seek to inform Decedent of the toxicity of VC.

37.  In 1961 Dr. Torkelson published Dow Chemical's animal study as a scientific article in a technical scientific journal. B.F. Goodrich received a copy of the article but did not distribute the information contained therein to its employees and agreed not to change SD-56. In particular, B.F. Goodrich did not inform Decedent or other employees in its plants of the information reported by Torkelson. B.F. Goodrich continued to assure workers that they could rely on the SD-56 statement that exposures below 500 ppm were safe.

38.  In 1963, a Romanian study was published by Dr. Suciu reporting liver damage in workers, including hepatomegaly, caused by VC. The study, which B.F. Goodrich obtained, noted that the liver damage could become chronic. By that time, B.F. Goodrich was conducting liver tests of its own employees found to have liver damage from their workplace VC exposures.

39.  In 1963, in response to the Torkelson study, the American conference of Industrial

Hygienists (ACGIH) changed its recommended exposure limit from 500 ppm TWA (time-weighted average) to 500 ppm as a ceiling. This meant that the industrial hygiene community was recommending that worker VC exposures never exceed 500 ppm. This information was not provided to Decedent or other workers being exposed to vinyl chloride and the MCA and B.F. Goodrich continued to use an exposure limit of 500 ppm TWA.

40.  On June 7, 1965, Rex Wilson of B.F. Goodrich wrote to a doctor treating a B.F. Goodrich employee who was suffering from liver damage caused by vinyl chloride exposure. Rex Wilson wrote that VC was recognized in "our experience" as a hepatotoxin and stated that because of this knowledge, B.F. Goodrich conducted liver function tests on exposed workers. Yet, B.F. Goodrich Safety Director, Herman Waltemate, testified that he did not learn that VC was a hepatotoxin until a decade later.

41.  On October 13, 1965, William McCormick, a senior corporate officer at B.F. Goodrich, sent to Dr. Kelly of Monsanto a copy of the Romanian study that described the development of liver damage in PVC workers.   Mr. McCormick instructed that the paper and its conclusions were to be held in strictest confidence.

42.  In 1965, the Province of Ontario, Canada adopted a 50 ppm exposure limit based upon the research conducted by Dow Chemical and Canadian researchers showing pathological effects at 100 ppm of VC exposure.

43.  In response to the new Canadian regulations, B.F. Goodrich adopted a 50 ppm exposure limit for VC workers in its London, Ontario plant, also requiring the use of air supplied respirators where there was a risk of elevated VC exposures. B.F. Goodrich did not adopt this 50 ppm exposure limit at any of its plants in the U.S., including the Henry, Illinois plant where

Decedent worked. Nor did B.F. Goodrich require the use of or provide air supplied respirators.

44.  On April 6, 1966, B.F. Goodrich's William McCormick wrote an internal memorandum to B.F. Goodrich Vice President Anton Vittone in which he noted that the American Conference of Governmental Industrial Hygienists (ACGIH) was proposing that the 500 ppm TLV for vinyl chloride be reduced to 50 ppm.  B.F. Goodrich continued to use SD-56 and to declare that the safe exposure level was 500 ppm.  B.F. Goodrich took steps to ensure ACGIH did not lower the TLV below the 500 ppm as set forth in SD-56.

45.  On October 6, 1966 the Manufacturing Chemists Association (MCA) PVC resin producers and the MCA Occupational Health Committee met in Cleveland, Ohio.  B.F. Goodrich's participants were W.E. McCormick, Rex H. Wilson, M.D., Wade Miller, Thomas B. Nantz and Anton Vittone. The group discussed acrosteolysis, a disease suffered by VC workers that they said had never been previously observed.  B.F. Goodrich's data was presented and it was recognized that there was a definite health problem related to polyvinyl chloride manufacture.  B.F. Goodrich requested that participants maintain the secrecy of the problem, and the other participants agreed that the information was to be treated as confidential. Any new findings were to be communicated to the MCA or B.F. Goodrich's Dr. Wilson.

46.  In a memorandum dated June 21, 1968, B.F. Goodrich's J. DiSalvo acknowledged that exposure of animals to VC at 500 ppm caused liver damage.  B.F. Goodrich did not inform Decedent or other employees in its plants of this fact.

47.  On January 26-27, 1970, the members of the MCA Safety and Fire Protection Committee met in New York City and discussed revising various chemical safety data sheets. Despite the fact that revisions to SD-56 were being discussed, and that the committee had clear

evidence that exposure to VC at 500 ppm was dangerous to workers' health, this group again refused to revise SD-56 to institute a lower exposure level.

48. At the MCA Safety and Fire Protection Committee (SFPC) meeting on December 14, 1971 in Washington, D.C., the participants again refused to change the 500 ppm exposure limit in SD-56. Representing and acting officially on behalf of B.F. Goodrich was D.L. Dowell.

49. On March 7, 1972 the MCA finally drafted a revised version of SD-56. Despite explicit knowledge to the contrary, SD-56 yet again assured that exposures up to 500 ppm were safe and that this level "provides considerable margin of safety for industrial exposures." B.F. Goodrich knew long before this time that there was no such margin of safety. That same year ACGIH reduced the recommended exposure limit from a ceiling of 500 ppm to a ceiling of 200 ppm.

50. On May 29, 1973, B.F. Goodrich's Benjamin M.G. Zwicker wrote an internal memorandum to the B.F. Goodrich plant Managers entitled "Proposed Information Response to Employee Questions." The draft document he attached to is memorandum, entitled "Human Health Effects of vinyl chloride," falsely states "We know of no serious problems with our employees from the proper use of vinyl chloride in our plants."

51. On May 31, 1973, R.N. Wheeler of Union Carbide sent a confidential memo discussing the plans of The Society of the Plastics Industry (SPI) for approval of the use of PVC for drinking containers and to identify only the hazards identified in SD-56. In addition, the members decided that through the MCA Vinyl Chloride Research Projects Group they would meet with NIOSH, but only disclose the hazards of SD-56 while concealing information they had previously received regarding the carcinogenicity of VC. In discussing these two actions, in

which B.F. Goodrich participated, Wheeler admitted in a memorandum that the actions "could be construed as evidence of an illegal conspiracy."

52.  On July 20, 1973, G.E. Best of the MCA wrote to the "management contacts" at companies sponsoring the Vinyl Chloride Research Program and the MCA Technical Task Group on Vinyl Chloride Research regarding the industry meeting with NIOSH on July 17, 1973.  He indicated that despite definite knowledge to the contrary, particularly about the carcinogenicity of VC, NIOSH was only given a copy of SD-56, which stated that exposure to vinyl chloride at levels less than 500 ppm was safe.  The "management contacts" active at that time who received this information indicating a cover-up of vinyl chloride hazards included B.F. Goodrich's McCormick, Johnson, Zwicker and Dowell.

53.  None of the "management contacts" at B.F. Goodrich, or from any other company, took any steps to correct the misinformation provided to NIOSH.

54.  On November 28, 1973, the Vinyl Chloride Research Coordinators of the MCA met to review and ratify the false information in SD-56.  Participants included M.N. Johnson, M.D. from B.F. Goodrich.

55.  On May 24, 1974, the MCA, on behalf of its members, issued a press release containing a chronology of knowledge about vinyl chloride hazards.  The chronology issued by the MCA affirmatively misstated the known hazards of exposure to VC and was incomplete and misleading by concealing the historical knowledge and historical research concerning vinyl chloride.

56.  At a meeting on December 7, 1974 of the SPI VCM/PVC Producers Group Committee in Washington, D.C., B.F. Goodrich's H.J. Fast, Cleveland Lane and John Nelson, among others,

met and ordered the public relations firm of Hill and Knowlton to publish pamphlets for PVC workers assuring them that they were not being exposed to hazardous levels of vinyl chloride, even though they knew that this was inaccurate and had no factual basis.

57.  On August 21, 1974 at the Tunney Senate hearings on vinyl chloride, SPI's Ralph Harding, the President of B.F. Goodrich, and Dow Chemical's Technical Specialist Ted Torkelson all testified.  Each witness falsely portrayed the historical knowledge as it related to vinyl chloride and vinyl chloride research by concealing the industry's knowledge of the hazards going back to the 1950's.

59.  On November 29, 1978, at the request of its members, including B.F. Goodrich, SPI published a booklet to provide to workers entitled, "*PVC, Health and Safety".*  The booklet was misleading concerning the present and historical information concerning vinyl chloride and health hazards.  It falsely advised workers that the cancer hazard of vinyl chloride in the workplace had been eliminated.

**B:  Agreement to conduct false and misleading studies for the sole purpose of concealing and misrepresenting the known dangers of exposure to vinyl chloride.**

60.  B.F. Goodrich knew when it first began manufacturing and working with vinyl chloride that the liver was a target organ damaged by exposure to VC. Studies repeatedly confirmed that the liver was a target organ damaged by vinyl chloride exposure. B.F. Goodrich then learned that VC caused cancers at multiple sites within the human body, including the liver, and also knew that these cancers were caused by exposures that were typical of on-going operations. In spite of this knowledge, B.F. Goodrich continued to adhere to and recommend the TLV of 500 ppm knowing it had no reliable scientific data upon which to base its fraudulent representations that exposures below that level were safe. These fraudulent misrepresentations

were continually made in spite of data indicating exposures below 500 ppm caused damage to the liver and other organs. B.F. Goodrich knew of, and even paid for, studies that clearly indicated that exposures below 500 ppm caused damage to the liver and other organs.

61.  At least as early as 196 or 1961 B.F. Goodrich was testing the liver function of workers because of the company's knowledge of the hepatotoxicity of vinyl chloride.  The workers at B.F. Goodrich were not told of the purpose of the examinations or of B.F. Goodrich's knowledge that vinyl chloride was toxic to the liver.

### Acroosteolysis Studies

62.  In the early 1960's, B.F. Goodrich discovered that some of its VC workers were suffering a hand condition known as acroosteolysis. On November 12, 1964, B.F. Goodrich's Corporate Medical Director, Rex Wilson, wrote to Dr. J. Newman in Avon Lake, Ohio, where a B.F. Goodrich plant was located.  Dr. Wilson, digging for information about acroosteolysis, stated that B.F. Goodrich wanted employees examined for "hand disabilities" as quietly as possible.  Dr. Wilson also wanted the examinations to occur as rapidly as possible but only incidental to other examinations.  Dr. Wilson instructed, "we do not want to have this discussed at all, and I request that you maintain this information in confidence."

63.  On February 2, 1965, Robert A. Kehoe of Kettering Laboratory wrote to Monsanto's Medical Director, R. Emmet Kelly, M.D.  Kehoe discussed the B.F. Goodrich hand problem, but instructed: "I shall be entirely willing, and am authorized to give you full information about this verbally, but I am not revealing the locus of the problem in writing at this time, since the people involved are deeply concerned despite the fact that there are very few cases, none of which has resulted in disability.  It is difficult not to conclude, on the face of the evidence, poor as it is, that

16

this is an occupational disease."

64.  On January 6, 1966, Monsanto's J. V. Wagner wrote an internal memorandum reflecting a conversation with B.F. Goodrich's Harry Warner, Corporate Vice President, in which Warner stated that B.F. Goodrich had first noticed the hand problem in workers several years before and that the problem had been noticed in employees who were not involved in kettle cleaning.  Warner also told Wagner about a Belgian doctor who had seen these problems in PVC workers and was about to publish an article.  According to Wagner's memo, "Goodrich was concerned enough about the response to such a published article that Mr. Warner attempted to have one of their representatives, who was in Europe, stop by and try to discourage or influence the wording of such an article to be sure that it didn't condemn PVC in general."

65.  On January 7, 1966, Dr. Kelly of Monsanto circulated an internal memorandum regarding his meeting with B.F. Goodrich.  The memo noted that Monsanto was x-raying people who were working in PVC polymerization.  Dr. Kelly stated, "I am sure Dr. Nessell can prepare these people with an adequate story so that no problem will exist."  Dr. Kelly also noted that he had to keep in contact with B.F. Goodrich because Dr. Wilson was on his way to Brussels to try to stop the publication of a paper.  Dr. Kelly stated, "while this is not completely hush hush, I think discretion should be used to prevent any undue talking, and the name of Goodrich should be kept in the background."

66.  On February 11, 1966, B.F. Goodrich's Dr. Rex Wilson wrote a confidential internal company letter to Dr. Creech who cared for employees at the B.F. Goodrich facility located in Louisville, Kentucky.  In this correspondence, Wilson asked Dr. Creech to "examine these people and determine whether or not they have any existing symptoms commensurate with

17

Raynaud's disease or scleroderma."  Included on the list of B.F. Goodrich employees that Dr. Wilson informed Dr. Creech to examine was their first acroosteolysis case, which had manifested in 1957. Wilson informed Creech that arrangements for a study by the Kettering Laboratory of Cincinnati, Ohio were made.  The results of Kettering's study have never been released by B.F. Goodrich or any other member of the industry.

67.  On December 21, 1966, the MCA Occupational Health Committee met in New York, NY.  It was decided that the MCA would enter into a contract with the University of Michigan for an epidemiological study of acroosteolysis.  Representing and acting officially on behalf of B.F. Goodrich were W.E. McCormick and Rex H. Wilson, M.D.

68.  On August 21, 1967, B.F. Goodrich published the article "*Occupational Acroosteolysis*" in the *Journal of the American Medical Association*.  This article was written by B.F. Goodrich management personnel Dr. Rex Wilson, M.D., William McCormick and Carroll Tatum along with contract physician, Dr. John Creech, M.D.  In the article they stated that the cause of acroosteolysis was "not presently known."  The article also stated that the syndrome "may" be of occupational origin.  Contrary to the article, Wilson and McCormick understood that acroosteolysis was directly related to vinyl chloride exposure.  Dr. Creech has admitted that he saw a draft of this paper where it was specifically stated that vinyl chloride was the cause of acroosteolysis, but this assertion was deleted from the final published paper.  The paper also falsely implied that the complaints began in mid-1964, when in fact they date back to the 1950's.

69.  On March 25, 1968, B.F. Goodrich received a proposal from Brooklyn Polytechnic Institute seeking continued support for the vinyl chloride acroosteolysis work it had carried out under the sponsorship of B.F. Goodrich from March 1, 1967 to February 22, 1968.  The results

of this work by Brooklyn Polytechnic Institute on vinyl chloride and acroosteolysis have never been published or made available.

70.  On June 26, 1968, B.F. Goodrich's W.E. McCormick wrote to B.F. Goodrich company physicians, enclosing a memorandum stating that at the request of B.F. Goodrich the Kettering Laboratory had reported that it had reproduced acroosteolysis in hamsters.  B.F. Goodrich has never produced a copy of this study, nor was it ever published.  The memorandum concluded that there would be no reporting to the State of Kentucky on occupational acroosteolysis without prior consultation with the B.F. Goodrich Medical Director in Ohio.  This was done despite the Kentucky law requiring cases of occupational disease to be reported.

71.  In February of 1969, B.F. Goodrich and others received a draft of a scientific publication from the University of Michigan that had been commissioned by the MCA and paid for by MCA members, including B.F. Goodrich.  The study recommended lowering exposure to vinyl chloride from 500 ppm to 50 ppm and conducting low level monitoring.  Recipients included John L. Nelson, William E. McCormick and Rex H. Wilson at B.F. Goodrich.

72.  On March 4, 1969, B.F. Goodrich's W.E. McCormick wrote an internal "Company Confidential" memorandum to W.C. Becker, B.F. Goodrich Vice President of External Affairs, entitled "Report of Hand Disability Activities."  McCormick noted that the University of Michigan's report had been distributed confidentially to the MCA Task Group for review  and recommended that "(1) The association between reactor cleaning and the occurrence of AOL [Acroosteolysis] is sufficiently clear-cut that steps should be taken to minimize the exposure of workers responsible for this operation…Where it is necessary for workers to enter the reactor tanks, sufficient ventilation should be provided to reduce the vinyl chloride concentration to 50

19

ppm; (2) Because of increasing evidence that the disease AOL may have systemic manifestations involving bones and possibly other systems, recognized cases should be removed from further exposure and should be examined at intervals to determine whether there is any progression of the disease."

73. On April 30, 1969, the MCA Occupational Health Committee met in Washington, D.C., including B.F. Goodrich's W.E. McCormick, where its members agreed to intentionally perpetrate the fraud that exposure up to 500 PPM was safe by voting to refuse to publish the University of Michigan's report, particularly its recommendations. Instead, the committee voted to accept the report for publication only if the recommendation to lower the TLV to 50 PPM was eliminated. B.F. Goodrich did not tell its employees, including Decedent, that it had rejected the recommendation that exposures be reduced from 500 ppm to 50 ppm.

74. On May 6, 1969, the MCA PVC Resin Producers met in Washington, D.C. In furtherance of their continued plan to perpetrate the fraud that VC exposure up to 500 PPM was harmless, it was unanimously resolved "that the University of Michigan be permitted to publish the scientific facts developed from the study as edited by the MCA members but that the complete document now available to the OHC and the sponsoring companies not be released but be held confidential for the sponsors only." Participants at this meeting included William E. McCormick and John L. Nelson from B.F. Goodrich.

75. On April 7, 1970, the MCA Occupational Health Committee met in New York, N.Y. and discussed the editorial changes required by the MCA committee. Thereafter, the published paper failed to contain the key information concerning the health hazards of vinyl chloride. Representing and acting on behalf of B.F. Goodrich was W.E. McCormick (although he was not

physically present at the meeting).

76.  In January of 1971, the University of Michigan published its epidemiologic study "Occupational Acroosteolysis." The report that was actually published by the University of Michigan failed to contain the 50 ppm recommendation for vinyl chloride exposure that it had made in its 1969 confidential version.  Furthermore, the Michigan article listed 400 ppm as the lower level of odor detection, when the 1969 version sent to the MCA had reported a 4,100 ppm odor level. Workers were deliberately being misled to believe that smelling vinyl chloride meant that they were being exposed to 400 ppm instead of over 4,000 ppm. Also, the confidential 1969 report made a recommendation for low level monitoring for VC, which was absent from the published version. These omissions were made because B.F. Goodrich and its confederates in the industry agreed to keep the damaging data developed by this study from workers, the United States Government and the general public.

77.  At the Vinyl Chloride Safety Association Meeting on November 10-12, 1971, B.F. Goodrich and others present referred to acroosteolysis (AOL) as bone cancer.  These same representatives who described the systemic condition as "bone cancer" when executives met among themselves, agreed that they would describe acroosteolysis in different terms in order to minimize it when speaking to their workers.   They recognized that AOL is caused by repeated exposure to low concentrations of vinyl chloride (50 ppm) even though publicly and to workers they refused to admit that vinyl chloride caused AOL.

**C:  Agreement to enter into a secrecy pact regarding knowledge of the carcinogenicity of VC.**

78.  On September 11, 1970, the MCA Occupational Health Committee, including W.E. McCormick of B.F. Goodrich, met in Montreal, Canada to address the European researcher P.L.

21

Viola's recent animal study finding evidence of cancer caused by VC.  Meeting attendees agreed this affected both VCM and PVC producers.

79.  MCA members, including B.F. Goodrich's W.E. McCormick, recognized that Dr. Viola's work produced cancer tumors from exposures below 5,000 ppm, leading to the conclusion that 100 ppm would not prevent tumors. Defendants agreed to fraudulently conceal this vinyl chloride danger and to give no warnings to workers, including Decedent.

80.  On November 16, 1971 the MCA held a vinyl chloride conference in Washington, D.C.  where participants noted that publication of Dr. Viola's work finding cancer in vinyl chloride-exposed animals could cause serious problems for the U.S. industry and that publication of the information should be suppressed.

81.  On November 23, 1971, Union Carbide's R. N. Wheeler wrote a trip report of his attendance at the November 16, 1971 MCA vinyl chloride conference.  He reported that Dr. Viola had found tumors at exposures of less than 5,000 parts per million.  Industry representatives specifically recognized that publishing Dr. Viola's work in the U.S. could lead to serious problems with regard to the vinyl chloride monomer and resin industry so they agreed to keep the information secret.

82.  B.F. Goodrich and its confederates recognized that they needed access to the European cancer research, but agreed that it should be kept secret and not disclosed to anyone beyond the MCA Vinyl Chloride Task Group.

83.  On August 16, 1972, D.M. Powell, on behalf of the European vinyl chloride industry, wrote to MCA's G.E. Best and noted that they had agreed to a secrecy agreement to hold confidential European data regarding carcinogenicity of vinyl chloride.

22

84. On October 19, 1972, the MCA's Kenneth Johnson wrote to members about the secrecy agreement with European researchers. Mr. Johnson stated that the members of the MCA's task group were the only ones entitled to receive information about the secret European project. The members whose companies had signed the secrecy agreement included W.E. McCormick of B.F. Goodrich.

85. In approximately November of 1972, B.F. Goodrich signed the secrecy agreement pledging to hold secret the results of European animal studies which had found cancer from vinyl chloride exposure. As a result of this agreement, B.F. Goodrich became aware of more research data that clearly showed that vinyl chloride caused angiosarcoma of the liver, a rare form of liver cancer, in animals exposed to less than permissible occupational levels. By this time, B.F. Goodrich already had at least 4 employees who had been diagnosed with this same cancer. B.F. Goodrich management continued to conceal the relationship between vinyl chloride and angiosarcoma of the liver from local plant doctors and its employees, including Decedent.

86. On November 14, 1972, the MCA Technical Task Group on Vinyl Chloride Research met in Washington, D.C. and members were given the secret European information that VCM caused angiosarcoma of the liver in animals exposed to just 250 ppm. Members representing and acting officially on behalf of their employers included W.E. McCormick of B.F. Goodrich.

87. On January 30, 1973, the Federal Government formally requested the submission of unpublished information regarding vinyl chloride hazards. The VCM/PVC industry, including B.F. Goodrich, refused to provide responsive information and plotted on how best to deceive the Government and not reveal the secret European information about the carcinogenicity of VC.

23

88.  On January 30, 1973, the MCA Vinyl Chloride Research Coordinators, including B.F. Goodrich's W.E. McCormick, met in Washington, D.C. where Dr. Torkelson of Dow Chemical, who had previously been dispatched to Europe to view the European studies, reported that the European research that found that vinyl chloride caused cancer was of high quality and that the results were undeniable.  Immediately thereafter, in a press release regarding vinyl chloride issued by MCA, the companies deliberately refused to mention the subject of cancer. In addition, at the same meeting, it was recognized that vinyl chloride was a component of aerosols but that industry could not stop selling vinyl chloride for aerosol use without risking disclosure of the cancer problem.  The group specifically recognized that aerosols could result in unlimited liability to the U.S. population while liability to workers would be limited by Workman's Compensation.

89.  On February 1, 1973, B.F. Goodrich's W.E. McCormick wrote Anton Vittone with copies to J.W. Miller, Jr., Vice President of B.F. Goodrich, Dr. R.W. Strassburg, Dr. Rex H. Wilson, B.F. Goodrich Medical Director and Benjamin M. G. Zwicker, B.F. Goodrich Director. McCormick stated "I am convinced that if the present European information becomes known to governmental agencies in the United States, and particularly to OCAW, URW and the [illegible] vinyl chloride will be classed as a carcinogen."

90.  Despite having substantial information about the carcinogenicity of VC at levels below the 500 ppm TLV, on February 28, 1973, B.F. Goodrich's W.E. McCormick, in furtherance of the company's underlying fraudulent behavior, wrote an internal memorandum to D.L. Dowell, B.F. Goodrich's Manager of Safety.  Mr. McCormick stated "the present OSHA level is 500 PPM (ceiling).  Regardless of what ACGIH does, we should go with the OSHA

24

level." At this time, B.F. Goodrich already had the secret European data showing cancer in animals exposed to vinyl chloride at 250 ppm. B.F. Goodrich withheld this information from OSHA, its workers and Decedent.

91. On May 21, 1973, B.F. Goodrich, represented by M.N. Johnson, and other members of the MCA Vinyl Chloride Research Coordinators met to discuss their obligations under the secrecy agreement they had previously signed. They admitted that the actions of the MCA they had authorized could be construed as an illegal conspiracy among industry if information were not made public or at least made available to the government. Nonetheless, the information about vinyl chloride causing cancer continued to be fraudulently concealed.

92. On July 17, 1973 the VC manufacturers met with NIOSH's Director, Marcus Key. Prior to the meeting they had agreed not to disclose their knowledge of the carcinogenicity of vinyl chloride as demonstrated in the European research. At the meeting, the industry representatives presented SD-56 as representing the position of MCA and its members regarding the hazards of vinyl chloride despite their knowledge that vinyl chloride was substantially more hazardous than the information defendants intentionally included in SD-56.

93. In December of 1973, B.F. Goodrich was informed by one of its contract physicians that three of its employees at the Lexington, KY PVC plant had been diagnosed with angiosarcoma of the liver. On January 23, 1974, B.F. Goodrich issued a press release about the deaths of the three employees in its polyvinyl chloride operations at Louisville who had died from angiosarcoma of the liver. B.F. Goodrich's press release did not mention the European data that B.F. Goodrich had concealed and which had shown several years earlier this very type of cancer in animals exposed to vinyl chloride.

94.  On February 15, 1974, OSHA held an informal hearing in which B.F. Goodrich's Anton Vittone was called to testify.  Mr. Vittone falsely represented that Viola's work had demonstrated cancers at 30,000 ppm when B.F. Goodrich was well aware that tumors were found at just 250 ppm.  Vittone failed to mention that B.F. Goodrich had received secret information concerning the relationship between vinyl chloride and angiosarcoma of the liver in November of 1972, or any of the earlier information that B.F. Goodrich had collected about vinyl chloride causing liver damage.

95.  On March 1, 1974, Dr. Maltoni published a report on vinyl chloride and animal testing and revealed his study findings, which demonstrated that vinyl chloride was capable of causing various types of cancer in animals including angiosarcomas.  This information had been disclosed to B.F. Goodrich and other signatories to the secrecy agreement in at least November of 1972.

96.  On March 16, 1974, Dr. Creech, the local B.F. Goodrich Louisville plant physician who had identified the cases of angiosarcoma of the liver, and Dr. Maurice Johnson, Corporate Medical Director of B.F. Goodrich, published a case report on angiosarcoma in the Journal of Occupational Medicine.  The article contained an editor's note concerning Dr. Maltoni telling OSHA in 1972 about his finding of angiosarcoma of the liver in animals exposed to vinyl chloride.  It was not until he read the editor's note added to his article that Dr. Creech, B.F. Goodrich's Louisville plant physician, first learned of Maltoni's work. Although Dr. Creech had been charged with protecting workers at the B.F. Goodrich's Louisville facility, B.F. Goodrich had not told Dr. Creech of Maltoni's findings.  Dr. Creech said he had diagnosed angiosarcoma in a B.F. Goodrich worker exposed to vinyl chloride years earlier but had not had any reason to

26

suspect that it had been caused by vinyl chloride.  B.F. Goodrich had intentionally hidden from its own physicians charged with the care of its workers the information that vinyl chloride had long been linked to angiosarcoma of the liver.

97.  On June 5, 1974, industry members, including Maurice Johnson from B.F. Goodrich, met with the European scientist Cesare Maltoni (University Bologna) in New York, N.Y.   The meeting was highly confidential and no notes were allowed.  The group learned of Maltoni's findings of injuries and tumors at just 50 ppm.

98.  On December 12, 1974, the MCA Technical Task Group on Vinyl Chloride Research met, with M.N. Johnson, M.D. present on behalf of B.F. Goodrich.  At this meeting the status of the European secrecy agreement was discussed.  It was specifically noted that the agreement remained in effect.

## Cancer Studies

99.  In response to information obtained from the European vinyl chloride industry in 1970 and thereafter indicating that vinyl chloride was a carcinogen, B.F. Goodrich and its confederates in the industry agreed to keep the European information secret and to conduct their own studies, which they would design and control.

100.  On February 20, 1973, B.F. Goodrich's representative, W.E. McCormick, participated in a meeting of the MCA Vinyl Chloride Research Coordinators where it was discussed how industry could best "defocus" potential concern about cancer by performing its own study.  A study proposed by Tabershaw Cooper & Associates (TCA) was discussed with the intent to use it as a smokescreen so the U.S. companies could show "diligence" if ever questioned about their knowledge and actions regarding vinyl chloride and cancer.  In a

deliberate effort to conceal its knowledge and concern about cancer, the members issued a press release concerning the study where the word "cancer" was not mentioned.

101.  On May 8, 1973, the MCA Board of Directors met in New York, N.Y. where they approved the TCA study explaining "the reason for moving quickly on this epidemiologic study is so that the U.S. industry must be prepared to indicate diligence and derive an appropriate handling of any problem that could arise."

102.  On June 19, 1973 the MCA signed a contract with Tabershaw Cooper & Associates (TCA) to conduct a cancer epidemiology study.  This was within thirty days of a planned industry meeting with NIOSH scheduled for July 17, 1973.  MCA issued a press release on June 28, 1973 concerning this study that intentionally did not contain anything to imply the U.S. vinyl producers had any reason to be concerned with occupational cancer, and deliberately directed attention away from any concern about cancer.  B.F. Goodrich was one of the companies sponsoring that study.

103.  On October 15, 1973, TCA issued a progress report on the epidemiology study which discussed the ways a terminated employee might be followed.  Further, TCA stated that several companies had indicated that they did not wish their terminated employees to be contacted directly.  This effort to hide the risk of cancer from older ex-employees had the effect of concealing the true extent of the cancer risk of vinyl chloride, because older retired employees were the ones most likely to have cancer.

104.  On December 19, 1973, TCA issued another progress report on its epidemiology study reporting that the exposure level determinations for the workers in the studies' cohort was not accurate.  The progress report also indicated that older workers, those most likely to have cancers from work exposures, had been excluded from the study. This not only concealed the

28

cancer risk factor for those workers but also falsely minimized the cancer risk of vinyl chloride.

105.  On April 15, 1974, TCA issued the first "final report" of its epidemiology study to MCA.  The study reported a measurable excess of digestive cancers, especially of the liver, and other cancers, including respiratory cancers and brain cancers.

106.  On May 3, 1974, TCA issued a second "final report" to MCA.  The previous TCA final report of April 15, 1974 was suppressed.  On May 4, 1974 TCA submitted a substantially modified third "final report" as MCA had requested.  This was the report that the MCA then submitted to OSHA, containing false and misleading information that fraudulently minimized the risk of cancer.

107.  On June 25 - 28, 1974 and July 8 - 11, 1974, the MCA submitted information to OSHA.  The vinyl manufacturers, including B.F. Goodrich, coordinated by the MCA, submitted substantially false or materially incomplete evidence at the OSHA hearings on the vinyl standard.

108.  On July 30, 1974, the MCA Vinyl Chloride Research Coordinators, including a representative of B.F. Goodrich, met in Washington, D.C.   The group voted to abandon animal studies which had been designed to find a no effect vinyl chloride exposure level, fearing that the actual results of such studies would show that there was no safe level of exposure.

109.  On September 18, 1974, the MCA Vinyl Chloride Research Coordinators, including B.F. Goodrich, met in Washington, D.C.  At this meeting it was acknowledged that a significant number of Union Carbide employees at Carbide's South Charleston plant who had vinyl chloride exposure were not included in the TCA study.  The intended effect was to exclude older high exposed workers who were the ones who most likely would suffer from cancer.

110.  On August 1, 1974, TCA published its epidemiologic study in the *Journal of*

*Occupational Medicine*.  The report that was published was based on the May 4, 1974 third

"final" report to the MCA.  It failed to address inadequacies and deliberate inaccuracies that were

used to conceal the true extent of the vinyl chloride cancer hazard.

111.  On January 10, 1975, Union Carbide's R.N. Wheeler wrote to MCA's Milton

Freifeld concerning a decision to exclude over a thousand of the most heavily exposed workers

from the on-going study of the hazards of vinyl chloride, in order to conceal the hazards of vinyl

chloride.

112.  On January 13, 1975, Dow Chemical's Torkelson wrote to TCA 's Director of

Health and Epidemiological Studies, Gaffey, about newly discovered employee records.  At the

time of the January 13, 1975 meeting, the group agreed to include only the most recently

exposed of the "newly discovered records."  This decision excluded the very workers from

Union Carbide's facility who were most likely to develop cancer from occupational exposure to

vinyl chloride and this deliberately concealed the true extent of the carcinogenicity of vinyl

chloride.

113.  On May 2, 1975, Dow Chemical's (Torkelson) wrote to the members of the MCA

Technical Task Group on Vinyl Chloride Research to plan how study results would be disclosed

so as to minimize concerns about the hazards of vinyl chloride.

114.  On May 22, 1975 the MCA Technical Panel on Vinyl Chloride Research (formerly

Technical Task Group) met in Washington, D.C.  The participants at this meeting, including Dr.

M.N. Johnson from B.F. Goodrich, discussed ways in which the study design could be altered to

further conceal the hazards of vinyl chloride.

115.  On May 30, 1975, TCA submitted a supplemental "final" epidemiological report to

MCA.  This report showed an increased incidence of brain cancer in the exposed group.  This

TCA report was never published.

116.  On June 3, 1975, B.F. Goodrich's W.J. Wilcox issued a strictly private interoffice memorandum regarding liver scan testing of its management employees who had received significant exposure, which was defined as having formerly received at least 3 years of exposure similar to that of a foreman operator. Wilcox instructed, "Please quietly scan [the liver of] the people in your organization."  The purpose of these examinations was not disclosed to workers.

117.  In September 1976, Equitable Environmental Health (EEH) (successor to TCA) submitted to MCA a final report on its supplementary epidemiological study of vinyl chloride workers.

118.  On October 12, 1976, the MCA Vinyl Chloride Research Coordinators including B.F. Goodrich's M.N. Johnson, met in Washington, D.C. to discuss the "final" report submitted by EEH.  The group recommended actions that needed to be taken, including having the project manager write to Equitable to remind them that both Torkelson and he had requested a draft of the report rather than the final version.  The group recommended to the panel that this report not be accepted or distributed further until changes had been made.  These actions were taken to conceal the hazards of vinyl chloride.

119.  October 13, 1976, the MCA Technical Panel on Vinyl Chloride Research, including B.F. Goodrich's M.N. Johnson, met in Washington, D.C.  The panel "accepted the research coordinators' recommendation that the report not be distributed to the panel or anyone else until necessary changes were made."  In the weeks to come, substantial modifications were made to the EEH report at the request of industry representatives.

120.  The MCA Vinyl Chloride Research Coordinators (VCRC), including M.N. Johnson from B.F. Goodrich, met on November 30, 1976 in Washington, DC and agreed that the draft of

31

the epidemiologic study report could not be sent out until the "necessary" changes were made. The "necessary" changes included a re-classification of the populations being studied, which had the result of concealing injuries. These post hoc changes in epidemiologic studies are not permitted by scientists and constitute fraud.  The MCA insisted on their changes on December 13, 1976.

121.  On August 18, 1977, EEH's Richard Davis wrote to MCA's J.T. Seawell.  This correspondence outlined the major changes that the sponsors had dictated.

122.  On September 8, 1977, the group that had reviewed the EEH study, including B.F. Goodrich, was aware that the study contained only five cases of angiosarcoma, even though there had been twenty-one cases reported in the United States by that time.

123.  On September 28, 1977, Dow Chemical's Torkelson wrote to the EEH with a copy to the MCA listing four pages of changes he and the sponsors wanted in the report.

124.  On October 12, 1977, EEH wrote Dow Chemical's Torkelson with a copy to MCA in which EEH stated, "we have edited the final report on the mortality study of vinyl chloride workers in line with the suggestions contained in your letter of September 28."  EEH further stated that they thought that the report should then be published in final form.  Torkelson then sent this letter from EEH to various sponsors, suggesting that each company be prepared to vote whether to accept the report.

125.  On October 20, 1977, Dr. Torkelson of Dow Chemical, acting on behalf of the MCA panel, gave approval for limited distribution of the study contingent upon changes being made as demanded by the MCA.

126.  On January 1, 1978, EEH submitted another "final" report to MCA.  The MCA then circulated the report to the MCA Vinyl Chloride Research Coordinators and Technical Panel on

February 14, 1978.  It was specifically stated "all sponsoring companies should take necessary action to ensure that distribution of all previous 'draft final' and products report to be terminated immediately as all reports issued to date are now rendered obsolete by the enclosed document dated January, 1978."

127.  On January 3, 1978, the Vinyl Chloride Safety Association met in Valley Forge, Pennsylvania.  At this meeting, it was noted that target organs for vinyl chloride are the linings of the small blood vessels and not just specific sites such as the liver and the brain.  Representing B.F. Goodrich was Herman Waltemate, a senior safety executive.

128.  On January 6, 1978 MCA's J.T. Seawell, the MCA vinyl chloride coordinator, wrote the Vinyl Chloride Research Coordinators and Technical Panel on Vinyl Chloride Research and noted that Dow Chemical's Torkelson had rewritten entire sections of the EEH report, including the discussion and the conclusion.  The purpose, and effect, of the rewrite was to conceal and minimize the hazards of vinyl chloride.

129.  On March 5, 1979, SPI's John R. Lawrence circulated to the PVC Safety Group a copy of Dow Chemical's position paper concerning recently discovered brain tumors, which was for internal use only and not disclosed to workers.

130.  On March 21, 1979, the MCA Vinyl Chloride Research Coordinators, including B.F. Goodrich's M.N. Johnson, met in Washington, D.C. where they recognized that none of the ten brain cancers from Union Carbide's Texas City plant were included in the EEH study. At this meeting, Torkelson presented work from Maltoni in which Maltoni had found brain cancer in animals exposed to vinyl chloride.   Additionally, the audit of IBT was discussed.  Dr. Busey, with Experimental Pathology Laboratories, stated that the evidence acquired to date led to the conclusion that an excessive number of animals were thrown away and that there was no

apparent attempt made to salvage tissues critical to the investigation.  This was done to prevent detection of the cancer in the animals.  The actions addressed in this meeting were among the continuing affirmative acts committed to misrepresent and conceal the fact that exposure to VC caused brain cancer.

131.  On September 20, 1979, the CMA Vinyl Chloride Research Coordinators, including M.N. Johnson of B.F. Goodrich, met in Washington, D.C. and were given a verbal report of a highly confidential study conducted in England by the Institute for Occupational Medicine on PVC workers at risk for lung problems equivalent to twenty cigarettes per day.  Although the Toxic Substance Control Act ("TSCA") Sec. 8(e) requires the reporting of substantially significant adverse health effects, this group failed to pass on the information it received concerning the lung problems.  The group also voted that there would be neither additional retrospective auditing nor any effort to summarize the IBT data at that time, the effect of which would be to further conceal the cancers.  R. N. Wheeler gave a report on the Texas City brain cancer problem.  As it related to brain cancer, Dr. Tamburro (of the University of Louisville) on behalf of defendant B.F. Goodrich reported to Dr. Torkelson that the University of Louisville was not studying brain cancer and did not anticipate studying brain cancer.

132.  On March 4, 1980, the CMA Vinyl Chloride Project Panel and Research Coordinators met in Washington, D.C. and discussed the January 15, 1980 letter from EEH concerning their study and particularly the excess brain cancer cases in PVC workers. The participants agreed that if the study were carried out the group would further confirm that brain cancer was caused by vinyl chloride exposure.  The participants discussed methods in which the study could be altered to conceal the excess brain cancers found in workers exposed to vinyl chloride.

34

133.  On September 17, 1980, the CMA Vinyl Chloride Research Coordinators, including M.N. Johnson from B.F. Goodrich, met in Washington, D.C.  The EHA had evaluated the validity of the underlying database of workers exposed to vinyl chloride and had reported that the integrity of the underlying database was poor.  Despite the receipt of a report that detailed the inadequacy of the database, the vinyl panel refused to allow EHA to correct even the most egregious errors in the underlying database, including deficiencies in over 3,000 records that EHA reported had rendered the records not usable.  Instead of attempting to remedy the defects in the data, the panel insisted that EHA analyze the deficient data in its unacceptable and unreliable state.

134.  On November 14, 1980 the CMA vinyl chloride industry representatives met in Pittsburgh, PA with Maurice N. Johnson participating on behalf of B.F. Goodrich. After discussing the need to correct the flaws in the unreliable database they decided that the "original cohort" should be left "as is" despite their knowledge that these misrepresentations were fraudulent.

135.  In October 1981, at the direction of B.F. Goodrich and its confederates, and acting through the MCA Vinyl Panel, industry contractor Clark Cooper published *Epidemiologic Study of Vinyl Chloride Workers:  Mortality through December 31, 1972*, which concealed and failed to reveal excess cancers and particularly brain cancers.

136.  On May 26, 1982, the CMA Vinyl Chloride Research Coordinators, including B.F. Goodrich's M.N. Johnson, met in Washington, D.C. The group acknowledged that they were not going forward with a case control study of brain cancer.  The group was advised that the brain cancer control study would show that brain cancers were caused by vinyl chloride exposure and therefore, for litigation purposes, it was best not to carry out the planned study.

35

137.  On September 30, 1983, the CMA Vinyl Chloride Research Coordinators, with M.N. Johnson participating on behalf of B.F. Goodrich, met in Washington, D.C. Prior to this meeting, the sponsors of the EHA study reclassified as exposed or not exposed some of the workers that were involved in the previous study.  In particular, a number of individuals (approximately 800) were now reclassified as not having been exposed to vinyl chloride although this information was not verified.  This resulted in the sponsors contracting and paying for the publication of a study in which they had excluded persons from the study by reclassifying them as not exposed without obtaining appropriate data or information, thus intentionally skewing the results.

138.  On August 15, 1986, the CMA's Manager of the Vinyl Chloride Panel, Has Shah, sent a draft of the EHA report by Wong to the Vinyl Chloride Panel.  On September 8, 1986, the CMA Vinyl Chloride Panel met in Oakland, California and agreed that EHA would need to revise the draft report based on the comments received by the CMA Vinyl Panel.  On October 16, 1986, EHA's Dr. Wong wrote Has Shah of CMA that he was submitting the final report.  He stated that, "comments from CMA on the draft report have been carefully considered in revising the report."

139.  On April 13, 1987, Dr. Doll submitted "*The Effects of Exposure to Vinyl Chloride, an Assessment of the Evidence.*"  This analysis was based upon false information provided to Dr. Doll by the CMA, particularly with regard to representations by the industry that their cancer studies were comprehensive and valid.  CMA intentionally misinformed Doll that the Wong study was a comprehensive and valid study and included all prior cohorts.

140.  On April 21, 1987, the CMA's Has Shah wrote to the Vinyl Chloride Panel members. Shah wrote about the courses of action the panel could take in an effort to minimize

the reports of cancer from the EHA report.  EHA had identified 37 deaths from liver and biliary cancers.  Shah noted that only 15 of these 37 were angiosarcomas.  Has Shah stated that there were two plausible explanations for this finding: (1) that vinyl chloride caused liver and biliary cancers other than angiosarcoma; or (2) the deaths were actually misdiagnosed angiosarcomas. In response to a proposal for further study the group agreed that there would be "no talking to decedent's families" to get accurate information.

141.  On October 20, 1987, ICI's Paddle wrote Dr. Doll enclosing correspondence dated October 9, 1987, noting that one third of the North American angiosarcomas in the angiosarcoma registry did not appear in Dr. Wong's paper.  In addition, one third of the North American angiosarcomas identified in Dr. Wong's paper were not present in Dr. Doll's submission.  These irregularities served to minimize the disclosure of the toxicity of vinyl chloride.

142.  On March 2, 1988, ICI's Bennett wrote to Dr. Doll.  Bennett stated there was no need to acknowledge any person or company as having helped in the vinyl chloride review because further study would be done solely to defend against litigation (and disclosure would indicate conflicts of interest).

143.  On May 8, 1989, SPI and the Vinyl Institute Health Safety and Environmental Committee met at Pine Mountain, Georgia.  W.C. Holbrook, Mike Voisin and Woody Ban participated on behalf of B.F. Goodrich and agreed to terminate the angiosarcoma registry in order to conceal the fact that vinyl chloride was continuing to cause angiosarcoma in PVC fabricators.

144.  On January 5, 1990, J.T. Seawell of the CMA (formerly known as the MCA) wrote to the Vinyl Chloride Project Panel and Vinyl Chloride Research Coordinators attaching an excerpt from the *Federal Register* dated December 18, 1979, where OSHA requested additional

information for a reassessment of the known health effects of vinyl chloride.  Mr. Seawell stated

that the CMA planned to resubmit all research reports that were previously submitted to pertinent

government agencies immediately after their acceptance by the Vinyl Chloride Research

Coordinators and the Vinyl Chloride Panel.  CMA together with its members affirmatively

agreed to withhold information that it had previously concealed.

**D:  Agreement to fraudulently misrepresent the "odor threshold" of vinyl chloride in order
to misrepresent exposures to vinyl chloride.**

145.  An "odor threshold" is the concentration or level of exposure at which a human

can smell a chemical. B.F. Goodrich and its industry confederates have made false and

contradictory statements to continuously mislead workers into believing they faced no toxic

hazard from VC.

146.  Prior to the mid 1970's, B.F. Goodrich told its employees, including Plaintiff, that

the fact that they smelled VC was no indication of danger.

147.  B.F. Goodrich repeatedly informed workers and published documents stating that

the odor threshold for vinyl chloride was approximately 250 ppm.  Thus, if a worker smelled

vinyl chloride, the worker would believe that the exposure was below the 500-ppm exposure

limit.

148.  B.F. Goodrich repeatedly informed Decedent during the course of his employment

prior to 1975 that there was no danger just because he could smell vinyl chloride.

149.  In a June 21, 1968, internal B.F. Goodrich memorandum to Fred Krause, J.G.

DiSalvo acknowledged that the odor threshold for vinyl chloride was 4,100 ppm.

150. When B.F. Goodrich finally conducted its own tests for the vinyl chloride odor

threshold in 1974, the lowest level at which the most sensitive subject could detect the vinyl

chloride was 2,000 ppm.

151. As late as April 1, 1975, a B.F. Goodrich memorandum still informed employees that the odor threshold was 260 ppm, thereby fraudulently concealing the truth. U.S. E.P.A., ATSDR, and ACGIH all state that the odor threshold for VC is 3,000 ppm.

**B.F. Goodrich Participated in a Civil Conspiracy**

152. B.F. Goodrich and its confederates in the VC/PVC industry entered into a conspiracy that by common design and mutual understanding was intended to accomplish unlawful ends and/or to reach lawful ends by unlawful means.

153. The conspiracy was intended to misrepresent and conceal material facts about the nature and extent of the risks of exposure to vinyl chloride and vinyl chloride-containing products from workers, including Decedent.

154. The conspiracy involved the common design and mutual understanding that the co-conspirators would fraudulently misrepresent and/or conceal material facts about the nature and extent of the risks of vinyl chloride from workers, including employees of B.F. Goodrich such as Decedent.

155. B.F. Goodrich and its confederates in the VC/PVC industry conspired to commit fraud, proximately causing the injuries to Decedent.

156. The conspiracy to engage in tortious misconduct included:

a. fraudulently misrepresenting, suppressing and concealing information relating to the hazards of vinyl chloride;

b. consciously, knowingly, intentionally, and willfully disregarding an obvious and imminent danger of serious injury or death to persons exposed to vinyl chloride, including Decedent;

c. failing and refusing to take precautions to avoid reasonably foreseeable injuries to workers, including Decedent, who would be exposed to VC;

39

d. intentionally permitting the overexposure of Decedent to vinyl chloride without his informed consent.

e. deliberately concealing information about the carcinogenicity of VC;

f. agreeing to misrepresent that 500 ppm was a safe exposure limit when B.F. Goodrich and its confederates knew that was not a fact; and

g. agreeing not to study health effects from vinyl chloride exposure in a timely manner.

157. Decedent was at all relevant times unaware of the true dangers associated with vinyl chloride exposure and was unaware of the true nature and extent of the risks associated with working in areas in which vinyl chloride was being used.

158. The following overt tortious acts were committed against Decedent by B.F. Goodrich in furtherance of the conspiracy:

    a.   exposing Decedent to hazardous levels of vinyl chloride without his knowledge or informed consent;

    b.   failing and refusing to provide adequate industrial hygiene controls and personal protective equipment to reduce or eliminate the dangerous effects of vinyl chloride;

    c.   failing and refusing to provide adequate warnings regarding the dangers and health effects of exposure to vinyl chloride;

    d.   failing and refusing to reasonably test or investigate the dangerous propensities associated with vinyl chloride;

    e.   participating in an industry-wide effort to fail and refuse to reasonably test or investigate the potential adverse health effects posed by the use of vinyl chloride in the work-place, including the concerted effort to misrepresent, misclassify, alter, and suppress epidemiological and toxicological studies, data, and other information concerning the toxicity of vinyl chloride;

    f.   participating in an industry-wide effort to consciously fail to protect Decedent and other workers whose employment responsibilities exposed them to vinyl chloride, of potential cancers and other ill health effects associated with exposure to vinyl chloride, including misrepresentation, misclassification, alteration, and suppression of epidemiological and toxicological studies, data, and other information relating to the toxicity of

vinyl chloride;

g. participating in an industry-wide effort to improperly influence, manipulate, alter, and misclassify epidemiological and toxicological data and scientific findings as reported by research concerning the health risks of vinyl chloride in the medical and trade literature;

h. participating in an effort to suppress knowledge concerning the toxicity and carcinogenicity of vinyl chloride that could be obtained by workers exposed to vinyl chloride, the government, and the general public;

i. participating in a concerted effort to continue the manufacture of a hazardous material in an ultrahazardous manner; and

j. falsely stating that 500 ppm was a safe exposure level when this was known not to be a fact.

159.  B.F. Goodrich carried out the conspiracy in part by acting with and through its trade organizations, including the MCA and SPI, and well as with other companies engaged in the production of PVC products.

**A: The conspiracy perpetrated the fraud that VC was harmless at exposures below 500 ppm.**

160.  In 1954, the MCA, along with the active participation of the MCA Vinyl Panel and the MCA OHC, including B.F. Goodrich, published a chemical safety data sheet for vinyl chloride monomer known as SD-56 which stated that the injury hazard of vinyl chloride monomer was from explosion, fire and frostbite burns, that there were no hazards when exposures were below 500 ppm, and that above 500 ppm the only hazard was an anesthetic effect.

161.  B.F. Goodrich and its confederates disseminated SD-56 to be used throughout the vinyl chloride industry and to be relied upon by employers, including B.F. Goodrich, with employees in the industry, including the Plaintiff, and customers.  B.F. Goodrich intended and agreed that the information in SD-56 would be the only information given to employees,

customers and workers.

162.  Despite having specific knowledge that statements and representations set forth in the SD-56 were false, incomplete and omitted material facts, B.F. Goodrich and its confederates continued to promote SD-56 throughout the 1950s, 1960s and into the 1970s.  The specific knowledge that contradicted the representations in SD-56 included, but is not limited to, the following:

a.  The earliest studies in the 1930's and 1940's showed liver damage from exposure to vinyl chloride;

b.  Reports from Europe in the 1940's, 1950's and 1960's indicated vinyl chloride workers developed liver damage;

c.  As early as the 1950's workers exposed to vinyl chloride had idiosyncratic injuries that were peculiar to vinyl chloride exposure;

d.  The industry's own experiments on animals showed that animals were injured when exposed to concentrations of vinyl chloride as low as 50 ppm;

e.  Studies done in Europe in 1964, 1969 and 1970, and secretly provided to B.F. Goodrich and its confederates showed injuries to workers exposed to vinyl chloride; and

f.  By 1965 vinyl chloride was known to B.F. Goodrich to be a hepatotoxin.

163.  B.F. Goodrich agreed with numerous other companies in the industry to make and participate in false statements regarding the false and fraudulent SD-56 Chemical Data Sheet.

**B:  The conspiracy to conduct fraudulent medical examinations, experiments and studies.**

164.  Beginning in the 1950's and continuing into the 1970's, B.F. Goodrich and its industry confederates conducted medical tests on their own workers, including the Plaintiff, and concealed from the workers the purpose of the testing and the nature of the findings. In addition, B.F. Goodrich and its industry confederates failed to tell employees about the injuries caused by vinyl chloride found in company examinations, and the causes of the workers' injuries.

165.  B.F. Goodrich and its industry confederates agreed to fraudulently conceal and affirmatively misrepresent the results of medical testing on VC workers.

166.  In the mid-1960s and continuing through the 1980s, B.F. Goodrich and its industry confederates agreed to assist in the publication of scientific studies that they had designed and altered to conceal the hazards of vinyl chloride.

167.  Beginning in the early 1970s, B.F. Goodrich and its industry confederates commissioned and controlled a series of epidemiological studies to fraudulently conceal the extent of cancers caused by vinyl chloride.  The initial corruption of the databases was recognized by subsequent contractors hired to perform further analysis or updates of this same cohort.  To fraudulently conceal the extent of cancer caused by vinyl chloride, B.F. Goodrich and its industry confederates made sure that certain plants were studied in a way that was inconsistent with how other plants were studied; that persons who were not independent and impartial were allowed to shuffle employees in or out of the cohort or shuffle employees' exposure classifications without any review or factual justification; and that, even in the 1980s, completely non-independent employees like plant managers or personnel officers were allowed to classify members of the cohort one way when they were alive and another way when they were dead.  B.F. Goodrich and its industry confederates knew that their scientific studies were, and intended them to be, false and misleading

168.  B.F. Goodrich and its industry confederates agreed to conduct fraudulent scientific studies and to manipulate data so as to minimize and misrepresent the known harm of exposure to vinyl chloride.

**C:  The conspiracy to enter into a secrecy pact regarding the carcinogenicity of VC.**

169.  B.F. Goodrich and its industry confederates agreed to conceal their knowledge of the carcinogenicity of vinyl chloride from Decedent, vinyl chloride workers and fabricators, the United States Government and the public at large.

170.  A written "Secrecy Agreement" was entered into among American vinyl chloride producers, including B.F. Goodrich, and the sponsors of the European cancer research, Solvay et Cie, Imperial Chemicals Industries (ICI), and other European vinyl chloride manufacturers.

171.  By September 20, 1972, B.F. Goodrich and its industry confederates agreed to the "Secrecy Agreement" which their agent, MCA, had negotiated on their behalf.  By the end of 1972, each American vinyl manufacturer who belonged to the MCA vinyl panel had signed a "direct pledge" of secrecy; this included B.F. Goodrich.  Additionally, every company that was allowed to participate in any of the meetings in which the secret European findings were discussed also signed or made such a secrecy agreement, including B.F. Goodrich.  The companies on the CMA Vinyl Panel who were parties to this particular secrecy agreement included B.F. Goodrich.  The vinyl chloride Research Coordinators included representatives from B.F. Goodrich.

172.  In furtherance of their conspiracy and fraud, B.F. Goodrich and its industry confederates that signed the secrecy agreement destroyed it to conceal their prior misconduct. Further, as part of a continuing conspiracy, the MCA and its successor organizations have completely destroyed all copies of the secrecy agreements they solicited.

173.  B.F. Goodrich and its industry confederates by agreement concealed their knowledge of the carcinogenicity of vinyl chloride by, among other things:

a.  concealing the existence of studies discussed in their own meetings;

b.  concealing their knowledge of the Italian studies by Maltoni and Viola showing that

44

vinyl chloride caused cancer in laboratory animals;

c. concealing from the United States government their knowledge of studies showing vinyl chloride caused cancer (in spite of requests from OSHA and NIOSH seeking all information about the toxicity of vinyl chloride); and

d. concealing from Plaintiff and all other vinyl chloride workers and fabricators the true results of their own studies.

174. The conspiracy among B.F. Goodrich and its industry confederates was intended to misrepresent and conceal material facts about the nature and extent of the risks of exposure to vinyl chloride and vinyl chloride-containing products from plaintiff and all other vinyl chloride workers and fabricators.

175. The conspiracy among B.F. Goodrich and its industry confederates involved the common design, substantial assistance and mutual understanding among all the parties to the conspiracy that B.F. Goodrich and its industry confederates would misrepresent and conceal material facts about the nature and extent of the risks of vinyl chloride and vinyl chloride-containing products from workers, including Decedent and employees of B.F. Goodrich and its industry confederates.

176. B.F. Goodrich and its industry confederates agreed to conceal the carcinogenicity of VC.

**D. The effect of B.F. Goodrich's conspiracy was to expose Decedent and other workers to dangerous levels of vinyl chloride without their knowledge or consent.**

177. As a direct and proximate result of the overt tortious acts committed by B.F. Goodrich in furtherance of its conspiracy with industry confederates, Decedent was unaware of the true health risks associated with his exposures to vinyl chloride.

178. As a further direct and proximate result of the overt tortious acts committed in furtherance of the conspiracy by B.F. Goodrich, Decedent, during the course and scope of his

45

employment by B.F. Goodrich from April of 1966 until sometime in 1974, was exposed to toxic levels of vinyl chloride, which directly and proximately caused him to develop hepatic angiosarcoma.

179.  Each of the foregoing tortious acts were performed by B.F. Goodrich and its industry confederates:

a.  in concert with each other;

b.  pursuant to a conspiracy;

c.  with the knowledge of B.F. Goodrich and its industry confederates that B.F. Goodrich's conduct constituted a breach of duty to Decedent which each entity gave substantial assistance or encouragement to accomplish; and

d.  with a common design among B.F. Goodrich and its industry confederates, and with substantial assistance from the other entities, to accomplish the result of harming workers, including Decedent.

180.  The tortious misconduct by B.F. Goodrich described above was committed with the malicious motive of endangering lives for the sake of profits.

181.  As a direct and proximate result of the overt acts committed by B.F. Goodrich in furtherance of the conspiracy, Decedent incurred substantial medical expenses, suffered severe pain of mind and body, disability, limitation, loss of the pleasure of life and ultimately died from his angiosarcoma of the liver.

182.  The tortious misconduct and overt acts of B.F. Goodrich, as set forth above and throughout the Complaint, was the proximate cause of the injuries to Plaintiff and Decedent.

## CAUSES OF ACTION

### COUNT I
### Negligence

183.  Plaintiff incorporates by reference all of the allegations of this pleading as if fully

46

rewritten here.

184. B.F. Goodrich and PolyOne Corporation, Decedent's employer from 1966 to 2012, conducted large-scale manufacturing and production activity at the Henry, Illinois, plant, including various operations utilizing significant amounts of vinyl chloride.

185. B.F. Goodrich required Decedent to work with and to be exposed to hazardous and toxic levels of vinyl chloride throughout the course of his employment between April of 1966 and sometime in 1974.

186. At all times relevant to this Complaint, B.F. Goodrich possessed medical and scientific data, along with other knowledge, which clearly established that vinyl chloride and other related chemicals were hazardous to the health and safety of its employees, including Decedent, who were required to work with and around these chemicals.

187. B.F. Goodrich had knowledge of the following facts while Decedent was being exposed to vinyl chloride at BFG Henry, Illinois plant:

    a. That B.F. Goodrich did not know what the safe exposure limit was until established by OSHA in 1975, yet told workers that 500 ppm was a safe exposure limit with a significant margin of safety;

    b. That from the earliest test data in the 1930's and subsequent data in the 1940's 1950's, and 1960's it was evident vinyl chloride caused damage to the liver;

    c. That vinyl chloride is a hepatotoxin;

    d. That vinyl chloride is a carcinogen which is capable of causing different types of cancer at different sites of the human body, including angiosarcoma of the liver;

    e. That the 500 ppm exposure limit B.F. Goodrich applied to the plant where Decedent worked had not been proven to be safe;

    f. That B.F. Goodrich did not know or monitor what Decedent's exposures were at any time prior to 1974;

g.   That vinyl chloride workers were substantially certain to contract cancers such as those demonstrated to have occurred in secret animal studies;

h.   That the carcinogenicity of vinyl chloride had been demonstrated in numerous animal toxicological studies and bioassays conducted under the auspices of European vinyl chloride and PVC manufacturers which B.F. Goodrich promised to and did keep secret from the U.S. Government, from employees including Decedent, and from the public at large; and,

i.   That the United States Governmental agencies regulating exposure of American workers and the American public-at-large were unaware of secret European studies demonstrating the association between exposure to vinyl chloride and the development of cancer.

188.  The information regarding the health effects of vinyl chloride which B.F. Goodrich provided to its employees, including Decedent, was incomplete and deliberately misleading with regard to the state of the knowledge of the carcinogenic potential of vinyl chloride.

189.  The information B.F. Goodrich provided to employees, including Decedent, concerning the health risks associated with exposure to vinyl chloride was false, incomplete, intentionally and fraudulently misleading and cynically reassuring.  B.F. Goodrich's employee and public educational efforts were deliberate misinformation campaigns conducted with the intent to defraud employees, including Decedent, as to the true nature and extent of the risk posed by the exposure to vinyl chloride.

190.  The information that B.F. Goodrich provided to employees, including Decedent, with regard to the nature and extent of exposures to vinyl chloride was false, intentionally inaccurate, fraudulently misleading, and cynically reassuring.

191.  B.F. Goodrich knew that the truth that vinyl chloride workers could contract liver injuries and cancer, and the exceedingly high levels of employee exposures to vinyl chloride it was permitting, would be bad for business.

48

192.  B.F. Goodrich negligently if not fraudulently withheld and concealed material information about vinyl chloride health hazards from Decedent and his co-workers intending that they should be and remain ignorant of the true facts regarding the dangers of vinyl chloride.

193.  While employed and working at the Henry, Illinois plant from April of 1966 until sometime in 1974, Decedent was exposed to significant levels of vinyl chloride far above those levels permitted by ACGIH or OSHA standards.

194.  B.F. Goodrich knew of Decedent's high levels and doses of vinyl chloride exposures and the fact that the levels of vinyl chloride exposure were far in excess of permitted ACGIH and OSHA levels.

195.  B.F. Goodrich knew that Decedent was repeatedly and routinely being exposed to levels of vinyl chloride in excess of the level which B.F. Goodrich professed was the safe exposure limit.

196.  At all relevant times B.F. Goodrich had knowledge of the existence of dangerous processes, procedures, instrumentalities or conditions in its Henry, Illinois, plant associated with the use of and exposure to vinyl chloride.

197. B.F. Goodrich knew that Decedent worked in the dangerous conditions, operated the dangerous processes and instrumentalities, and followed the dangerous procedures of the Henry plant during the years from April of 1966 until sometime in 1974.

198.  B.F. Goodrich knew, or in the exercise of ordinary care, should have known, of the unreasonable risk of harm to human health posed by exposure to vinyl chloride.

199.  B.F. Goodrich, under the circumstances set forth above, and with such knowledge, required employees, including Decedent, to perform dangerous tasks, exposing them to vinyl

49

chloride during the years from April of 1966 until sometime in 1974.

200.  B.F. Goodrich engaged in conduct that negligently exposed Decedent to dangerous amounts of vinyl chloride without his knowledge or consent during the years from April of 1966 until sometime in 1974, including:

      a.   failing to exercise reasonable care to protect Decedent from dangerous levels of exposure to vinyl chloride;

      b.   failing to warn Decedent of the known and reasonably foreseeable danger of contracting liver disease, including angiosarcoma, from exposure to vinyl chloride at the levels B.F. Goodrich permitted in its Henry plant;

      b.   failing to instruct Decedent in the safe and proper handling of and working with vinyl chloride;

      c.   failing to provide and require the use of adequate personal protective equipment to reduce to safe levels or eliminate exposures to vinyl chloride;

      d.   failing to provide adequate engineering controls to reduce to safe levels or eliminate hazardous exposures to vinyl chloride;

      e.   failing to conduct necessary and appropriate personal and area monitoring to assure safe levels of exposure to vinyl chloride;

      f.   failing to provide Decedent with a safe place to work;

      g.   failing to conduct necessary and appropriate tests to determine safe exposure levels for vinyl chloride; and

      h.   committing such other acts that caused or resulted in Decedent being exposure to unsafe levels of vinyl chloride.

201.  B.F. Goodrich knew or should have known that Decedent and other employees could be injured by their dangerous vinyl chloride exposures.

202.  B.F. Goodrich was aware of animal studies dating back to the 1930's showing liver damage from vinyl chloride exposures.

203.  B.F. Goodrich was aware of studies dating back to the 1940's-1960's of vinyl

chloride workers in which they were found to have liver damage from vinyl chloride exposure.

204.  B.F. Goodrich was aware in the 1960's that its own employees who had performed the same tasks as Decedent, under the same or similar conditions, had suffered liver damage from vinyl chloride exposure.  As a result, B.F. Goodrich considered vinyl chloride a hepatotoxin from even before the time Plaintiff began working at the Henry plant.

205.  B.F. Goodrich was aware by 1959 that exposures to vinyl chloride at a TWA of 500 ppm would cause appreciable injury.

206.  B.F. Goodrich knew that it took no measures until 1974 to protect Decedent from vinyl chloride exposures at levels commensurate with or in excess of those found to cause liver damage in B.F. Goodrich employees, animal studies or vinyl chloride worker studies.

207.  B.F. Goodrich's corporate environmental health department was responsible for establishing exposure limits for the company, but until 1974 intentionally refused to impose safe exposure limits because of the negative impact they would have on productivity and profits.

208.  B.F. Goodrich required Decedent to work with vinyl chloride so as to experience dangerous levels of exposure during the years from April of 1966 until sometime in 1974.

209.  B.F. Goodrich owed Decedent a duty of care to provide a safe place to work, to maintain the Henry plant in a safe and suitable condition, to not expose him to toxic and hazardous levels of chemicals such as vinyl chloride, to warn him about the dangers of exposure to vinyl chloride, and to train him how to work safely in his job.

210.  B.F. Goodrich breached its duty to provide a safe place to work and its duty of care due to Decedent.

211.  As a direct and proximate result of the breaches of duty by B.F. Goodrich, and the

unsafe exposures he received during the years from April of 1966 until sometime in 1974, Decedent developed hepatic angiosarcoma, experienced severe pain, suffering, mental anguish and the injuries as set forth above, and then died from this disease.

212.  Defendants are liable for negligence as the successors to B.F. Goodrich.

## COUNT II
## Fraud and Fraudulent Concealment

213.  Plaintiff incorporates by reference all of the allegations of this pleading as if fully written here.

214.  B.F. Goodrich intentionally made material misrepresentations of fact, and deliberately concealed material facts, all of which was relied upon by Decedent and proximately caused his injuries.

215.  B.F. Goodrich deliberately misrepresented the hazardous and toxic effects of vinyl chloride to Decedent, who developed an occupational disease as a direct result.

216.  B.F. Goodrich misinformed Decedent, based upon SD-56 (of which B.F. Goodrich was a co-author), that the only health hazards from exposure to vinyl chloride were fire, explosion, anesthetic effects and frostbite.  B.F. Goodrich also trained Decedent that the only systemic effect from vinyl chloride was as a mild general anesthetic at concentrations well above 500 ppm and that the 'safe limit' for vinyl chloride was 500 ppm.

217.  The representations about vinyl chloride made by B.F. Goodrich to Decedent were fraudulent because among other things:

   a.  B.F. Goodrich deliberately misrepresented that 500 ppm was a safe limit even though it knew that there was no scientific evidence to support this statement; knew that no studies of chronic effects from vinyl chloride at or below 500 ppm (or any other level) had been conducted; and knew that studies showed evidence of liver damage in animals at 500 ppm and below;

b.  B.F. Goodrich deliberately misrepresented that the only systemic effect of vinyl chloride exposure was as a mild general anesthetic and that the only health hazards were from fire, explosion or frostbite even though it had evidence prior to 1966, when Decedent began working at the Henry plant, of liver damage in both animals and humans from vinyl chloride exposure;

c.  B.F. Goodrich deliberately concealed and refused to disclose to Decedent that the 500 ppm standard was not based upon studies of chronic effects or effects in humans, but just a single test of the acute effect on guinea pigs, while telling him that 500 ppm was a safe exposure limit with a significant margin of safety;

d.  B.F. Goodrich deliberately concealed and refused to disclose to Decedent that the odor threshold for VC was over 2,000 ppm, not 260 ppm as represented by B.F. Goodrich to Decedent and other employees;

e.  B.F. Goodrich deliberately concealed and refused to disclose to Decedent that European studies in 1947, 1959 and 1963 reported liver injuries to workers exposed to vinyl chloride;

f.  B.F. Goodrich deliberately concealed and refused to disclose to Decedent that in 1959 Dow Chemical researchers found liver damage in animals at exposures of 100 ppm, had not identified a no-effect level, and reported this information to BFG;

g.  B.F. Goodrich deliberately concealed and refused to disclose to Decedent that in 1959 Dow Chemical told B.F. Goodrich that extended exposure at a TWA of 500 ppm "is going to produce rather appreciable injury;"

h.  B.F. Goodrich deliberately concealed and refused to disclose to Decedent that Dow Chemical recommended and Ontario, Canada adopted a 50 ppm exposure limit even though B.F. Goodrich continued to give assurances that 500 ppm was a safe exposure level;

i.  B.F. Goodrich deliberately concealed and refused to disclose to Decedent that it knew and had experience showing that vinyl chloride was a hepatotoxin;

j.  B.F. Goodrich deliberately concealed and refused to disclose to Decedent that numerous studies reported that vinyl chloride caused liver injuries in workers;

k.  B.F. Goodrich deliberately concealed and refused to disclose to Decedent that by 1964 B.F. Goodrich had workers with liver injuries it believed were caused by exposure to vinyl chloride;

l.  B.F. Goodrich deliberately concealed and refused to disclose to Decedent that it had no knowledge what his exposures to vinyl chloride were or whether they were even below the 500 ppm TLV because it did not conduct systematic air-monitoring of vinyl

chloride levels prior to 1974;

m. B.F. Goodrich deliberately concealed and refused to disclose to Decedent that it had no knowledge of what the safe exposure limit for vinyl chloride actually was; and

n. B.F. Goodrich deliberately concealed and refused to disclose to Decedent that his work with and exposure to vinyl chloride was not safe.

218.  B.F. Goodrich corporate management intentionally decided not to provide complete, accurate or adequate warnings about the vinyl chloride health hazards to Decedent or other employees. The corporate managers who had actual knowledge of the nature and extent of the vinyl chloride health hazards, but chose not to disclose that information to Decedent and other employees included, but are not limited to, Anton Vittone, Benjamin M.G. Zwicker, John Nelson, Maurice Johnson, William McCormick, and Rex Wilson, M.D.

219.  B.F. Goodrich corporate management fraudulently concealed from Decedent material facts about vinyl chloride health hazards.

220.  During the course of Decedent's employment, plant managers and plant safety personnel provided inaccurate, incomplete and inadequate warnings and training based on the misinformation contained in SD-56, that Decedent relied upon to his detriment.  This misinformation was provided as part of Decedent's initial employment training and thereafter in memoranda, correspondence and training sessions.

221.  Decedent relied to his detriment upon the representations of B.F. Goodrich, including those contained within and based upon SD-56, that working with and being exposed to vinyl chloride was safe except at extremely high levels.

222.  As a direct and proximate result of B.F. Goodrich's fraud and fraudulent concealment, Decedent developed angiosarcoma of the liver and suffered serious illness, physical

and emotional pain and suffering and emotional distress and the injuries as set forth above, and then died.

223.   Defendants are liable as successors to B.F. Goodrich.

**Count III**
**Willful and Wanton Misconduct, Gross Negligence, And Intentional, Knowing, And**
**Reckless Wrongdoing**

224.   Plaintiff incorporates by reference all of the allegations of this pleading as if fully rewritten here.

225.   The manufacture and use of vinyl chloride is an unreasonably dangerous activity that poses an extreme, unreasonable, and unnecessary risk of harm to persons using or being exposed to vinyl chloride, including Decedent in his work at B.F. Goodrich's Henry plant.

226.   B.F. Goodrich's acts and omissions, as set forth above, indicate an actual conscious and deliberate indifference towards the rights, health, safety and welfare of employees, including Decedent, and amount to willful and wanton misconduct, gross negligence, and intentional, knowing, and reckless wrongdoing.

227.   During Decedent's work at the B.F. Goodrich Henry plant he was needlessly exposed to hazardous levels of vinyl chloride. B.F. Goodrich had actual knowledge for years before Plaintiff ever started working at the Henry plant that exposure to vinyl chloride could cause liver injuries and that vinyl chloride was a hepatotoxin. In spite of this knowledge, B.F. Goodrich required workers, including Decedent, to be exposed to and use this toxic and carcinogenic chemical.

228.   By the time the Henry plant was constructed in 1965, B.F. Goodrich had the knowledge and capability of making the workplace safe from hazardous VC exposures. Instead,

B.F. Goodrich chose not to adopt safe practices and engineering controls.

229.  Decedent's angiosarcoma of the liver and death was a natural, direct, probable, and foreseeable consequence of his exposure to vinyl chloride at the Henry plant proximately caused by B.F. Goodrich's willful and wanton misconduct, gross negligence, and intentional, knowing and reckless wrongdoing.

230.  Defendants are liable as successors to B.F. Goodrich.

**Count IV**
**Loss Of Consortium**

231.  Plaintiff incorporates by reference all of the allegations of this pleading as if fully rewritten here.

232.  Candice Martin, surviving spouse of Decedent Rodney Martin, asserts her individual cause of action for loss of consortium proximately caused by the wrongful conduct of B.F. Goodrich as set forth above.

233.  Consortium is the mutual right of a husband and wife to that affection, solace, comfort, companionship, society, assistance, and sexual relations necessary to a successful marriage, for which elements of damage Candice Martin is entitled and herein seeks to recover.

234.  As a direct and proximate result of the aforesaid acts of B.F. Goodrich, Candice Martin sustained injuries and damages for her loss of consortium.

235.  Defendants are liable as successors to B.F. Goodrich.

WHEREFORE, Plaintiff demands judgment against all defendants, jointly and severally, for

compensatory damages for wrongful death and as a survival action in an amount as yet to be

determined but in excess of the jurisdictional requirement for this court, prejudgment and post-

judgment interest for all elements of damage that such interest is allowed, and such other and

further relief as the Court deems just and equitable.

Respectfully submitted,

    */s/Patrick J Jennetten*
Patrick J. Jennetten, Esq.—Lead Counsel
Law Office of Patrick Jennetten, P.C.
2708 Knoxville Ave.
Peoria, IL 61604
(309) 670-2400

Hobson & Bradley
Herschel L. Hobson, Esq.
Tina H. Bradley, Esq.
Andrew S. Lipton, Esq. (Of Counsel)
316 13th St.
Nederland, TX 77627
(409) 836-6410

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

    */s/Patrick J Jennetten*
Patrick J. Jennetten, Esq.